# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2014

## STATE OF TENNESSEE v. CONNIE SUE MESSICK

**Direct Appeal from the Circuit Court for Coffee County**
**No. 39,271      L. Craig Johnson, Judge**

---

**No. M2014-00116-CCA-R3-CD - Filed May 6, 2015**

---

The appellant, Connie Sue Messick, pled guilty in the Coffee County Circuit Court to vehicular homicide by intoxication, one count of reckless aggravated assault, and four counts of vehicular assault. The trial court sentenced the appellant to a total effective sentence of sixteen years in the Tennessee Department of Correction. On appeal, the appellant challenges the length and manner of service of the sentences. Upon review, we affirm the judgments of the trial court but remand for entry of a corrected judgment to reflect that reckless aggravated assault is a Class D felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Douglas D. Aaron, Manchester, Tennessee, for the appellant, Connie Sue Messick.

Robert E. Cooper, Jr., Attorney General & Reporter; Ahmed A. Safeeullah, Assistant Attorney General; C. Michael Layne, District Attorney General; and Felicia B. Walkup and Marla R. Holloway, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On January 12, 2012, the Coffee County Grand Jury returned an indictment charging the appellant with reckless vehicular homicide, vehicular homicide by intoxication, four counts of vehicular assault, and reckless aggravated assault. On August 26, 2013, the

appellant entered into a plea agreement whereby the charge of reckless vehicular homicide would be dismissed in exchange for her guilty pleas to the remaining charges.

At the guilty plea hearing, the State recited the following factual basis for the pleas, which was stipulated to by the appellant:

> [O]n or about November 25th, 2011, the [appellant] had picked up her two children, Nora Cheney, approximate age 15, and Sean Cheney, approximate age 14, from the [appellant's] parents' home in Coffee County to spend time with the children. The [appellant] had driven in from out of state earlier that same day. The [appellant's] son, Sean, remained with the [appellant] throughout the evening up until the crash. The [appellant] dropped off her daughter, Nora, with friends for a previously arranged outing prior to the crash.
>
> . . . .
>
> According to Nora Cheney, the [appellant's] driving was scaring her on the way into town from Highway 280 so she asked the [appellant] if she could drive. Nora drove the [appellant] and Sean into town. Nora further stated that the [appellant] was smoking marijuana on the drive into town and repeatedly offered Nora vodka. After Nora left the [appellant] and Sean to go with friends, the [appellant] and Sean continued to Tullahoma to Taco Bell to talk with the [appellant's] friend. The [appellant] was driving. Sean stated that he knew that the [appellant] was drinking. The [appellant] told Sean that she had mixed some kind of drink with vodka on her way from out of state that very same day. Sean further stated that the [appellant] drank several shots of vodka straight from the bottle while they were headed toward Tullahoma from Manchester.
>
> When they left Tullahoma, the [appellant] mixed vodka with a Sonic drink, and the [appellant] drove back toward Tullahoma (sic). At this point, the proof would show that the [appellant's] speech was so slurred that Sean could not understand her, and as she drove back to Manchester, the [appellant ] began to vomit. Sean tried to get the [appellant] to stop and also tried to get the [appellant's] cell phone to call 911

but was unsuccessful. Sean stated that the [appellant] was driving approximately 100 miles per hour and almost wrecked a couple of times prior to the crash. Sean stated that his mother passed cars in the turning lane to the left at times.

Meanwhile, Mr. Stanley George and his mother, Mrs. Ruby George, as well as Ms. Heather George, Ms. Layla George, and Mr. Jordan Meeker were all riding together in Ms. Ruby George's white Nissan Rogue. Mr. Stanley George, Mrs. Ruby George, and Ms. Layla George had ridden out to the vicinity of Rutledge Falls to pick up Ms. Heather George and Mr. Jordan Meeker who had a minor single-car accident in which they were not injured. Mr. George was the driver. Ms. Ruby George was in the front passenger seat. Mr. Jordan Meeker was in the back seat behind the driver. Ms. Heather George was in the middle position in the back seat, and Ms. Layla George was seated in the rear far right seat.

According to the witnesses, the Rogue driven by Mr. Stanley George was stopped at a red light on Highway 55 at Oak Drive in Manchester headed toward town. The Rogue was in the left lane of the two-lane highway. It was the first car at the light in that lane. There was a car stopped beside the Rogue in the right lane. The light was red at the time of the crash. Several witnesses, in addition to Sean Cheney who was in the vehicle with [the appellant], had noticed her dangerous driving prior to the crash. Several people called 911 before and after the crash. Witnesses to the [appellant's] driving prior to the crash reported the [appellant] was driving at a high rate of speed. One witness even described how the sedan sounded like an 18-wheeler when it went by him and shook his doors, and that the vehicle was rushing up behind vehicles, as well as passing dangerously, in that the [appellant] would utilize the turn lane to pass vehicles. This information is corroborated by Sean's statements.

A witness was actually on the phone with 911 when the crash occurred. The crash occurred at approximately 7:40 [p.m.] at the intersection of Highway 55 and Oak Drive in Manchester, Coffee County, Tennessee. The [appellant] crashed her vehicle into the rear of the vehicle driven by Stanley George. Witnesses

-3-

who saw the crash described what they saw from several vantage points. Witnesses are consistent that the vehicle driven by the [appellant] was going way over the speed limit, and the [appellant] did not brake before striking the Rogue driven by Mr. George. There was no sound of squealing tires described by anyone. In fact, they reported the absence of squealing tires. The witnesses also state that Stanley George's vehicle was completely stopped for the red light at the time of the crash.

After the horrific crash, several witnesses stopped and remained at the scene. These witnesses observed that none of the occupants of the Rogue were able to get out of the vehicle on their own. More than one witness describes Sean Cheney getting out of the [appellant's] vehicle and laying on the ground and being very upset and saying over and over that "She wouldn't stop. I tried to get her to stop. She's drunk. I tried to get her to stop." More than one witness describes how the [appellant] refused to get out of her vehicle when law enforcement made contact with her. Local media was able to take a few photographs at the scene. One photograph depicts a near empty vodka bottle on the roof of the [appellant's] vehicle that had been removed from the vehicle by law enforcement.

Sean Cheney was injured in the crash, and this is referring to Count Six, Your Honor, of the indictment which is vehicular assault, a D felony. He was injured in the crash in that his collarbone was broken. He was transported by ambulance to receive medical care. He continued to say in the ambulance that the [appellant] would not stop and that he was trying to get her to stop. The injuries to the five victims trapped in the Rogue varied, but all were trapped, and had to be either assisted or extricated from the vehicle. Ms. Layla George, age 11, and this refers to Count Seven, Your Honor, reckless aggravated assault, a D felony, received only minor injuries, but she was transported to Harton Hospital. Her injuries included contusions to her left knee, lower leg, and foot, as well as an acute lumbar strain. Although the night of the crash, her medical records reported no broken bones, family has stated that later, a broken bone in her foot was discovered. She left the emergency room with crutches and instructions for follow-up care.

Ms. Heather George, age 17, and this refers to Count Four, Your Honor, vehicular assault, suffered a fractured pelvis in the crash, as well as severe back and pelvic pain. Witnesses describe Ms. Heather George as utilizing a wheelchair to get around for weeks after the crash. Follow-up care was required. Ms. George still suffers pain today as a result of the crash.

Mr. Jordan Meeker, 18 years of age, and this refers to Count Five of the indictment, vehicular assault, suffered a very painful separated pelvis in the crash. Evidence shows that Mr. Meeker was in severe pain at the accident scene and local hospital. Mr. Meeker was transported to the local hospital in the same ambulance as Sean Cheney, and Mr. Meeker remembers him stating over and over in the ambulance that he had tried to get the [appellant] to stop the vehicle, so much so that a medical provider in the ambulance had to calm Mr. Cheney down. Mr. Meeker was transported by helicopter to Vanderbilt University Hospital. Mr. Meeker remained in the hospital for several days, including two days in the critical care unit. After discharge, Mr. Meeker was confined at home and unable to walk for an extended amount of time. Witnesses describe Mr. Meeker being immobile in a chair at his parents' home. Mr. Meeker utilized a walker for months after the accident and underwent much aftercare. Mr. Meeker still suffers pain from the crash today. Mr. Meeker started college after the accident as had been planned, but he was unable to finish the first semester of classes because he was having mental trauma caused by the crash.

Mrs. Ruby George, and this is Count Three, Judge, vehicular assault, [Mrs.] Ruby George is the mother of Stanley George, the deceased. She was 78 at the time of the crash, and she suffered 17 rib fractures as well as a punctured, collapsed lung in the crash. All of the ribs that were fractured were ribs in her back, and she suffered extreme pain in her back. She was transported to Vanderbilt Hospital by helicopter where she remained for several days. Upon discharge from Vanderbilt, she was moved to a rehab facility and then continued her rehabilitation upon her return home. Mrs. George was conscious at the scene. She described her son, Stanley George, as being conscious at the scene as well, and that the crash caused

him to go up under the steering wheel in his seat in a reclining position. She remembers him needing air and being unable to breathe. She described that as the emergency personnel were going to attempt to help Stanley George, he expelled a breath and went unconscious and that she knew that she had watched her son take his last breath. Mr. Stanley George was still restrained by his seat belt when Officer Alberto Garza with the Manchester Police Department got to him. His air bag did not deploy. Your Honor, this is Count One. He was in a reclined position and trapped under the steering wheel. Another witness, a nurse, removed the head rest from the seat so that Mr. George might be more comfortable. Mr. George became unresponsive while he was still in the vehicle. Emergency personnel found no signs of life while in transit to United Regional Medical Center. Mr. George was pronounced dead by Dr. David Florence at 8:53 [p.m.]. An autopsy revealed that Mr. George's cause of death was multiple blunt force injuries to the torso, including injuries to his lung, vertebrae, ribs and pancreas. The impact of the crash inflicted multiple tears to his aorta. Mr. George was 58 years old at his death.

The [appellant] was transported by law enforcement to United Regional Medical Center. The officer stated that the [appellant] had a very strong odor of alcohol about her person. She had suffered injuries to her lower extremities. While there, the officers asked for and obtained a blood specimen for analysis by TBI. According to the TBI analysis, the [appellant's] blood alcohol level at the time the specimen was drawn at 8:37 [p.m.] was .27. In addition, TBI ran toxicological analysis, which revealed that the [appellant] had marijuana in her system as well, which corroborates what Nora, the [appellant's] daughter, stated about the [appellant] smoking a joint prior to the crash.

The plea agreement provided that the trial court would determine the length and manner of service of the sentence; therefore, a sentencing hearing was held. At the hearing, Timothy David Bishop testified that he lived in Clarksville and that on November 25, 2011, he and his wife were in Tullahoma visiting his grandmother, who was in the hospital. When he and his wife left the hospital, it was nighttime. Bishop drove in the left-hand lane on Highway 55 toward Manchester. As he was driving, he saw headlights behind him; the

vehicle appeared to be traveling "[w]ell over the speed limit." Bishop moved into the right-hand lane, and the vehicle passed him, shaking the sport utility vehicle (SUV) that he was driving. Bishop saw the vehicle "dodging in and out, switching lanes and back over, and switching lanes and back over." Within seconds, the vehicle disappeared from his line of sight. Bishop noted that although traffic was not heavy, other vehicles were on the road at that time.

Bishop stated that he next saw the vehicle at "the first red light off of Highway 55 between Tullahoma and Manchester." He stopped when he realized a wreck had occurred. Bishop grabbed a safety vest from inside his vehicle and ran to the nearest vehicle, which was the vehicle driven by Stanley George. He said that the Georges' vehicle was destroyed. He noted that "[t]he rear of the vehicle was pushed up to the back passenger seat. The back of the vehicle was actually touching the passengers in the back seat."

Bishop said that when he arrived, everyone was still inside the vehicle. Bishop spoke to the occupants of the vehicle. Stanley[1] said that he was hurting and having chest pains; his speech was slurred, and he had no energy. Bishop saw that the steering wheel was pushed against Stanley's chest. Emergency medical services (EMS) workers arrived, and Bishop helped them remove Stanley from the vehicle. In order to extricate Stanley, they had to "almost rip the door off the car." Stanley lost consciousness during the process.

Bishop realized that the appellant was the driver of the vehicle that had just passed him and that she had "rear-ended" the Georges' vehicle at the light. The appellant remained in her vehicle after the impact. Her son, Sean Cheney, was out of the vehicle and was being cared for by two or three people. Sean was crying and hurt. Bishop heard Sean say "that he told her she shouldn't be driving and not to drive." Bishop heard the appellant say that she was worried about her son and ask where he was. Although Bishop did not get close to the appellant's vehicle, he could smell a strong odor of alcohol coming from the vehicle. Bishop said that as the police tried to get the appellant out of her car, they pulled a bottle of "clear liquid alcohol" from inside the car and placed it on the roof.

On cross-examination, Bishop said that when the police got the appellant out of her car, she had no visible injuries.

Melinda Sawyer, a presentence investigator with the Board of Probation and Parole, testified that she prepared the presentence report. She said that the thirty-six-year-old appellant had no prior convictions. The appellant acknowledged using marijuana since she

_____

[1]Because some of the individuals in this case share a surname, we will refer to them by their first names. We mean no disrespect to these individuals.

was eighteen years old. Sawyer said that the appellant "did not maintain one job for a long period of time, but . . . she did stay employed." Sawyer stated that testing revealed the appellant's blood alcohol content at the time of the blood draw was .27. The appellant's blood also tested positive for marijuana.

On cross-examination, Sawyer said that when she spoke with the appellant, the appellant was open and honest.

On redirect examination, Sawyer said that she had received victim impact statements from Sean Cheney; Jordan Meeker; Jordan Meeker's mother, Debra Meeker; Ruby George; Stanley's sister, Karen McCullough; Stanley's brother, Randall George; and Stanley's son, Danny George.

In his statement, Cheney said that he could not trust his mother anymore and that he was afraid when riding in a car. Cheney's injuries from the wreck included a broken collarbone, bruised ribs, and a small cut on his palm.

In his statement, Jordan Meeker said that the wreck resulted in severe bruising to his lower back and a separated pelvis. He spent one and one-half days in the hospital then underwent physical therapy. Because of his injuries, he missed a lot of his senior year of high school. He continued to have back pain daily and nightmares about the offense.

In her statement, Ruby George said that Stanley was her firstborn son and that she "had to see him draw his last breath and to know there was nothing [she] could do to help him." During the wreck, Ruby suffered seventeen rib fractures and a punctured lung. She was in critical care in the hospital for seven days, in a rehabilitation center for six days, and had home health care for a couple of months. She continued to have pain and could do nothing without her ribs hurting. Her medical bills, which were paid by her insurance company, totaled $132,400.62. Her 2011 Nissan Rogue, which she had owned for only six months prior to the wreck, was totaled. Her insurance company paid $29,267.02 to have it replaced.

In her statement, Karen McCullough said that she could not sleep after the accident and that she was afraid when driving. She had developed several symptoms of depression, including difficulty concentrating, fatigue, low energy, anxiety, and persistent sadness. She said that she felt guilty, worthless, and helpless. In his statement, Danny George, Stanley's son, said that he was unable to sleep at least once a week due to anxiety.

Debra Meeker said in her statement that after the wreck, her son Jordan missed part of his senior year of high school because he had to use a wheelchair, walker, or crutches to

get around. Jordan had to go through physical therapy, and he slept in a recliner for a month because he was not able to get out of bed. Jordan had nightmares and pain in his back and hips, which forced him to quit certain jobs. She said they had been told that he might always have pain. She noted that not all of Jordan's medical bills had been paid.

Susan Leigh George, Stanley's wife, testified that at the time of the wreck, Stanley was fifty-eight years old. They had been married for thirty-five years and had three children: thirty-six-year-old Valerie Lemons, twenty-nine-year-old Robin McDaniel, and twenty-seven-year-old Daniel George. Susan and Stanley also had four grandchildren. Susan said that their family, which included Stanley's siblings and parents, was very close and that Stanley's death was an emotional and a financial loss. She said that she and Stanley did everything together because they enjoyed each other.

Susan said that around 5:30 p.m. on the day of the wreck, Ruby called and said that Heather, Susan's niece, had been in a minor accident. Ruby asked Stanley to go with her to pick up Heather. Stanley agreed and drove Ruby's 2011 Nissan Rogue. Two hours later, two policemen came to Susan's door and informed her of Stanley's death. Days after the incident, Susan saw the Rogue. She said, "It was totaled. It was totally pushed in from the back, just – it was bad." Ruby's insurance company paid her $27,272.61 for the vehicle.

Susan said that the aftermath of Stanley's death had "consumed" the lives of her and her family and that she was "still trying to cope." She said that the appellant "has called the shots in how my life is unfolding from the moment she slammed into the back of the car Stanley was sitting in at a red light. All plans for Stanley's future and our future together came to an end." Susan stated that she could not "think straight" and that her "short-term memory has suffered," noting that she seemed "to live a lot of [her] life relying on Post-it notes placed everywhere." She asked the trial court to impose the maximum sentence.

Robin George McDaniel, Stanley's daughter, read a statement to the trial court. She said that she was "haunted" by thoughts of her father's death because he had been in pain and unable to breathe. She was also "haunted" by the thought of her grandmother having to watch Stanley die while being unable to comfort him because she was trapped and badly injured. McDaniel said that since the wreck, she was "not the same person," and she suffered from depression.

Ronnie Meeker, Jordan Meeker's father, testified, "My son is not my son no more. He has had changes, moody, won't let go and drive." Additionally, Ronnie's wife had been "consumed" by the aftermath of the wreck.

Melinda Quinn, a special agent forensic scientist with the toxicology unit of the

Tennessee Bureau of Investigation's (TBI) crime laboratory, testified that she tested a sample of the appellant's blood that was drawn after the wreck. The blood tested positive for marijuana metabolite, which indicated that the appellant had used marijuana "within 24 hours ago or more." Agent Quinn could not be more specific about when the substance was used. The appellant's blood alcohol content was .27.

Mark Messick, the appellant's fifty-five-year-old cousin, testified that the appellant was approximately thirty-eight years old and that he had known her all her life. He said that the appellant "seems like a good decent person who has had some trouble." He explained that the appellant had a "failed marriage" and jobs that did not last. He and the appellant had lived next door to each other for two years. During that time, he had never seen a party at her house and had not witnessed her drink alcohol or smoke marijuana. He opined that the instant offenses were "out of step" with the appellant's character, noting that she was "raised better" and had never been in trouble before the accident.

On cross-examination, Mr. Messick acknowledged that he did not know the appellant had been using marijuana since she was eighteen years old.

The appellant made an allocution, saying that she accepted full responsibility for her actions and that her "behavior was atrocious." She acknowledged that her poor decisions led to pain being inflicted on the victims, the victims' families, and her family. Her children refused to speak to her for one year after the wreck, but they were in the process of rebuilding a relationship. The appellant asserted that she had always been a caregiver and a role model. She apologized to the victims and said that she prayed for them and wanted their forgiveness. She said that her life had been changed. She was no longer able to practice as a licensed practical nurse and had entered beauty school as "another outlet and another profession in which I can help people." She maintained that she had eliminated bad influences in her life and had made new friends.

The trial court sentenced the appellant as a standard, Range I offender to nine years for the vehicular homicide by intoxication conviction, three years for each vehicular assault conviction, and four years for the reckless aggravated assault conviction. The court ordered that the nine-year sentence, the four-year sentence, and one of the three-year sentences were to be served consecutively. The court further ordered that the remaining three-year sentences were to be served concurrently with the nine-year sentence, for a total effective sentence of sixteen years. On appeal, the appellant challenges the length of the sentences, the imposition of consecutive sentencing, and the denial of alternative sentencing.

## II. Analysis

Initially, we note that the appellant argues that this court should conduct its sentencing review de novo. However, our supreme court has held that on appeal, the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in her own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of her sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

## A. Length of Sentence

The appellant first challenges the length of the sentences imposed by the trial court. She specifically complains that the trial court erroneously applied two enhancement factors. In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also

-11-

Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

As a Range I, standard offender, the appellant was subject to a sentence of eight to twelve years for the vehicular homicide by intoxication conviction, a Class B felony, and two to four years for each vehicular assault conviction and for the reckless aggravated assault conviction, Class D felonies. Tenn. Code Ann. §§ 39-13-102(a)(1)(B)(ii), (e)(1)(A)(v); 39-13-106(a), (b); 39-13-213(a)(2), (b)(2); 40-35-112(a)(2) (Supp. 2011).

In sentencing the appellant, the trial court applied the following enhancement factors: (1) that the appellant has a previous history of criminal behavior in addition to that necessary to establish the appropriate sentencing range; (6) that the personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great; and (10) that the appellant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(1), (6), (10).

Initially, we note that the appellant does not challenge the application of enhancement factor (10). Tenn. Code Ann. § 40-35-114(10). The trial court applied this enhancement factor because the appellant "knowingly, and after being warned, chose to drive recklessly while intoxicated, endangering everyone on the highway that evening." We agree that the trial court properly applied this enhancement factor. State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995).

The trial court applied enhancement factor (1) based upon the appellant's admitted marijuana usage. The appellant complains that she is "being penalized for being honest to the preparer of the presentence report[. Her] honesty should not be the basis for an enhancement factor to her sentence." Concerns regarding the use of this factor as a result of a defendant's honesty have been noted by this court in the past. Nevertheless, this court has repeatedly upheld a trial court's using a defendant's disclosure of criminal activity as an enhancement factor. See State v. Keel, 882 S.W.2d 410, 419 (Tenn. Crim. App. 1994); State v. J'Menski C. Holt, No. W2010-02186-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 5, at *11-12 (Jackson, Jan. 4, 2012); State v. Montez Duncan, No. W2010-02263-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 866, at *13 (Jackson, Nov. 23, 2011). But see State v. Nathanael Little, No. W2011-02199-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 445, at

*31-32 (Jackson, May 28, 2013) (Tipton, P.J., dissenting); State v. Paul Neil Laurent, No. M2005-00289-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 180, at *41 (Nashville, Feb. 27, 2006) (Hayes, J., dissenting). We conclude that the trial court did not abuse its discretion by applying this enhancement factor.

The appellant next challenges the application of enhancement factor (6). See Tenn. Code Ann. § 40-35-114(6). The appellant first argues that "since the loss of life and injuries to the individuals makes up the elements of the criminal offenses, such could not be considered as enhancing factors." We agree. Serious bodily injury is an element of the charged offenses of vehicular homicide, vehicular assault, and reckless aggravated assault; therefore, the victims' bodily injuries cannot be used to enhance the appellant's sentences under factor (6). Williamson, 919 S.W.2d at 82 (vehicular homicide and vehicular assault); State v. Erica D. Goodner, No. E2007-01048-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 401, at *83-84 (Knoxville, Mar. 10, 2009) (reckless aggravated assault). Nevertheless, the trial court did not apply enhancement factor (6) on the basis of the victims' bodily injuries.

Instead, the trial court applied enhancement factor (6) to the vehicular assault of Ruby George upon finding that her "property loss was over $27,000." The appellant contends that this factor should not have been used to enhance the sentence for the conviction involving injury to Ruby because "the victim was completely made whole from any of those damages through insurance." This court has previously agreed that a trial court should consider any insurance payments prior to calculating the amount of property damage suffered by a victim. See State v. Burton W. Webb, No. E2013-02107-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 737, at *17 (Knoxville, July 29, 2014). But see State v. Harold Hack, No. W2005-02801-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 956, at *28 (Jackson, Dec. 5, 2006) (approving the application of enhancement factor (6) upon proof that the victim's vehicle was totaled during the offense).

Nevertheless, the State argues that enhancement factor (6) should be applied based upon the victims' psychological injuries. Our supreme court has stated "that enhancement factor (6) contemplates psychological or emotional injuries, as well as physical injuries, provided that the evidence establishes that such injuries are 'particularly great.'" State v. Arnett, 49 S.W.3d 250, 260 (Tenn. 2001). The court further explained:

> While we recognize that all victims of crime . . . must surely experience mental trauma, we are aware that no two crimes are exactly the same, and no two victims react to [a] crime in the same manner. Because some victims may suffer even more severe emotional trauma than is normally involved with [an] offense, our legislature has seen fit to enhance the punishment

for those defendants causing "particularly great" psychological
injury.

Id. Therefore, to support the application of this enhancement factor, there must be "specific and objective evidence demonstrating how the victim's mental injury is more serious or more severe than that which normally results from [an] offense. Such proof may be presented by the victim's own testimony, as well as the testimony of witnesses acquainted with the victim." Id. We conclude that given the ample proof adduced at the sentencing hearing regarding the severe psychological injuries suffered by the victims, this enhancement factor was correctly applied to the appellant's sentences. Regardless, the length of the sentences imposed by the trial court was justified by the application of enhancement factors (1) and (10).

## B. Consecutive Sentencing

Next, the appellant challenges the trial court's imposition of consecutive sentencing. Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria.

In the instant case, the trial court imposed consecutive sentencing upon finding that the appellant was a dangerous offender. Tenn. Code Ann. § 40-35-115(b)(4). In order to find that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting Wilkerson, 905 S.W.2d at 938); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

The appellant complains that the trial court erred by finding her to be a dangerous offender. We conclude that the record amply supports this finding. The record reveals that the appellant was drinking vodka and smoking marijuana while her two children were in the vehicle. Her driving so frightened her children that her fifteen-year-old daughter Nora asked to drive. As Nora drove, the appellant repeatedly offered her vodka. After leaving Nora with friends, the appellant resumed driving, taking several drinks of vodka straight from the bottle.

Although the appellant's son Sean begged her to quit drinking and to stop driving, she ignored his pleas. The appellant drove approximately 100 miles per hour, weaving in and out of traffic and almost causing two other wrecks. The appellant did not attempt to apply her brakes before colliding with the victims' vehicle, which was stopped at a red light. The appellant's blood alcohol content was .27, well above the legal limit. Further, the trial court found the requisite Wilkerson factors. We conclude that the trial court did not abuse its discretion by finding the appellant to be a dangerous offender. See State v. William Jeffery Sweet, No. E2008-00100-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 591, at *62-69 (Knoxville, July 21, 2009).

## C. Alternative Sentencing

Finally, the appellant contends that the trial court erred by failing to grant her an alternative sentence of split confinement. An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The appellant's sentences meet this requirement. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The appellant's conviction of vehicular homicide is a Class B felony; therefore, she is not considered to be a favorable candidate for alternative sentencing for this conviction. However, the appellant should be considered to be a favorable candidate for alternative sentencing for her convictions of vehicular assault and reckless aggravated assault, which are Class D felonies, respectively.

The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining

if an alternative sentence would be appropriate.  See Tenn. Code Ann. § 40-35-103(5).

The appellant complains that the trial court denied alternative sentencing based upon a need for deterrence.  However, the record belies this contention.  The trial court denied alternative sentencing after determining that to do so would depreciate the seriousness of the offenses.  The appellant's drug and alcohol consumption while driving with her children in the car, her failure to stop driving despite her children's pleas for her to do so, the excessive speed at which she was driving, and her weaving in and out of traffic and nearly causing other accidents in addition to the one for which she was convicted all contributed to the seriousness of the offenses.  Accordingly, we conclude that the trial court did not abuse its discretion by denying alternative sentencing.

Although not raised by the parties, our review of the record reveals that at the guilty plea hearing, the State announced that in count seven the appellant was pleading guilty to reckless aggravated assault and that it was a Class C felony.  At the sentencing hearing, defense counsel questioned whether reckless aggravated assault was a Class D felony, not a Class C.  The State advised the trial court that at the time of the offense, reckless aggravated assault was a Class C felony.  A discussion ensued, and the trial court sentenced the appellant to four years for a Class C felony.  We note however that at the time of the offense, reckless aggravated assault was a Class D felony.  Regardless, the four year sentence imposed by the trial court was within the range for a Class D felony.  Therefore, we remand to the trial court for correction of the judgment for reckless aggravated assault to reflect the proper class of offense.

### III.  Conclusion

In sum, we conclude that the trial court did not abuse its discretion in sentencing the appellant.  Therefore, the judgments of the trial court are affirmed, but the case is remanded for correction of the judgment of conviction for reckless aggravated assault in count seven to reflect that it is a Class D felony.

_____
NORMA McGEE OGLE, JUDGE

-16-